**CITY OF SOUTH PASADENA; National Trust for Historic Preservation; Sierra Club; California Preservation Foundation; Los Angeles Conservancy; Pasadena Heritage; South Pasadena Preservation Foundation; South Pasadena Unified School District, Plaintiffs,**

v.

**Rodney E. SLATER, Secretary of Transportation; Kenneth R. Wykle, Federal Highway Administrator; Federal Highway Administration; Jose Medina, Director, California Department of Transportation; California Department of Transportation, Defendants.**

**No. CV 98–6996 DDP MANX.**

United States District Court,
C.D. California.

May 26, 1999.

Jan Chatten–Brown, Jan Chatten–Brown Law Offices, Los Angeles, CA, Antonio Russman, Roger B. Moore, Antonio Russman Law Offices, San Francisco, CA, for Sierra Club, Los Angeles Conservancy, Pasadena Heritage.

Antonio Russman, Roger B. Moore, Antonio Russman Law Offices, San Francisco, CA, Carolyn Douthat, Carolyn Douthat Law Offices, Oakland, CA, for California Preservation Foundation.

Antonio Russman, Roger B. Moore, Antonio Russman Law Offices, San Francisco, CA, for South Pasadena Preservation Foundation.

David V. Rose, Wright Robinson Osthimer & Tatum, Los Angeles, CA, Antonio Russman, Roger B. Moore, Antonio Russman Law Offices, San Francisco, CA, for South Pasadena Unified School Dist.

Leon W. Weidman, Monica L. Miller, AUSA, Office of U.S. Atty., Civil Div., Los Angeles, CA, for Rodney E. Slater, Kenneth R. Wykle, Federal Highway Admin.

Glenn B. Mueller, Dept. of Transp., Legal Div., San Diego, CA, for James W. Van Loben Sels, California Dept. of Transp., California Transp. Com'n, Does 1 through 100, City of Alhambra.

Joseph W. Pannone, Kane Ballmer & Berkman, Los Angeles, CA, Donald P. Johnson, H. Francisco Leal, Beltran & Medina, Los Angeles, CA, Antonio Rossmann, Roger B Moore, Antonio Rossman Law Offices, San Francisco, CA, for City of Pasadena.

Steven M. Friedman, Heller Ehrman White & McAuliffe, Los Angeles, CA, Antonio Russman, Roger B. Moore, Antonio Russman Law Offices, San Francisco, CA, Elizabeth S. Merritt, Nat. Trust for Historic Preservation, Washington, DC, Steven Russell Tekosky, Johnson & Tekosky, Los Angeles, CA, for National Trust for Historic Preservation.

Jeffrey A. Joseph, Dept. of Transp., Legal Div., San Diego, CA, for Jose Medina.

## ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION TO DISMISS

PREGERSON, District Judge.

The defendants' motions to dismiss came before the Court for oral argument on April 19, 1999. After reviewing and considering the materials submitted by the parties and hearing oral argument, the Court grants in part and denies in part the motion.

## BACKGROUND

This case involves a proposal to extend the 710 (Long Beach) Freeway between the 10 (San Bernardino) Freeway and the 210 (Foothill) Freeway (the "710 Freeway Project"). The 710 Freeway Project will involve construction in the cities of Los Angeles, South Pasadena, and Pasadena.

The 710 Freeway Project has a long history. The state government originally proposed building the 710 Freeway Project in the mid-1940s. In 1973, the City of South Pasadena sued state and federal defendants under state and federal environmental laws to require the preparation of an environmental impact statement ("EIS"). In 1973, Judge Crary of this Court issued an injunction against further development of the 710 Freeway Project pending the production of specific environmental documents. In 1998, Judge Rea of this Court vacated the injunction finding that the state and federal agencies had prepared the appropriate documentation. The parties stipulated to a dismissal of the 1973 suit.

Subsequently, the plaintiffs herein filed two lawsuits alleging that the defendants did not comply with state and federal laws in creating the environmental reports. One lawsuit, filed in Sacramento superior court, alleged violations of California law. The second lawsuit, filed in this Court, alleged violations of federal law.

In the hopes of consolidating all of the claims, the parties stipulated to a stay in the state proceedings and the plaintiffs filed an amended complaint in this Court alleging violations of both state and federal laws.

The state and federal defendants have brought separate motions to dismiss certain claims contained within the plaintiffs' first amended complaint. The state defendants have moved pursuant to the Eleventh Amendment to dismiss all claims arising under California law (First Am.Compl. ¶¶ 166–214). The federal defendants have moved to dismiss specific allegations under the Clean Air Act (First Am.Compl. ¶¶ 144–152, 155). Both the state and federal defendants have filed motions to dismiss the plaintiffs' claims for improper congressional influence (First Am.Compl. ¶¶ 158–65).

In the alternative, the California defendants have brought a motion for a more definite statement on the plaintiffs' claims of improper congressional influence and suppression of other agency assessments (First Am.Compl. ¶¶ 194–96). The federal defendants have joined this motion insofar as it seeks clarification on the claim of improper congressional influence.

## DISCUSSION

### I. Motions to dismiss

#### A. *Legal standard*

Dismissal under Rule 12(b)(6) is appropriate when it is clear that no relief could be granted under any set of facts that could be proven consistent with the allegations set forth in the complaint. *See Newman v. Universal Pictures*, 813 F.2d 1519, 1521–22 (9th Cir.1987). The court must view all allegations in the complaint in the light most favorable to the non-movant and must accept all material allegations—as well as any reasonable inferences to be drawn from them—as true. *See North Star Int'l v. Arizona Corp. Comm'n*, 720 F.2d 578, 581 (9th Cir.1983).

#### B. *State defendants' motion to dismiss state law claims*

■ The state defendants have moved to dismiss the plaintiffs' claims which arise under state law. They assert that these claims are barred by the Eleventh Amendment, which states:

> The Judicial Power of the United States shall not be construed to extend to any suit in law or equity, or commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State.

U.S. Const. amend. 11. The courts have consistently held that this amendment precludes suits against a state by its own citizens in federal court. *See Hans v. Louisiana*, 134 U.S. 1, 10 S.Ct. 504, 33 L.Ed. 842 (1890).

The Eleventh Amendment bars individuals from bringing civil suits "which seek either damages or injunctive relief against a state, an 'arm of the state,' its instrumentalities, or its agencies." *Franceschi v. Schwartz*, 57 F.3d 828, 831 (9th Cir.1995). "In determining whether an entity is an arm of the state, [a federal court] look[s] to 'the way state law treats the entity.'" *Id., quoting Mitchell v. Los Angeles Community College Dist.*, 861 F.2d 198, 201 (9th Cir.1988).

The Ninth Circuit has held that the California Department of Transportation ("Caltrans") is a state agency. *Southern Pac. Transp. Co. v. City of Los Angeles*, 922 F.2d 498, 508 (9th Cir.1990). Therefore Caltrans has Eleventh Amendment immunity in this case from suits arising under state law.

Additionally, the Eleventh Amendment bars relief against state officers on the basis of violations of state law. *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 120–121, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984). Therefore, Jose Medina,[1] the director of Caltrans, also has Eleventh Amendment immunity in this case.

Eleventh Amendment immunity, however, is not absolute. A state may waive its Eleventh Amendment immunity. *Welch v. Texas Dept. of Highways and Pub. Transp.*, 483 U.S. 468, 473, 107 S.Ct. 2941, 97 L.Ed.2d 389 (1987). A waiver can be either explicit or constructive. *See Erwin Chemerinsky, Federal Jurisdiction* § 7.6 at 406 (2d ed.1984). However, a federal court will find that a state has expressly waived the immunity "only where stated 'by the most express language or by such overwhelming implications ... as [will] leave no room for any other reasonable construction.'" *Welch*, 483 U.S. at 473, 107 S.Ct. 2941, *quoting Murray v. Wilson Distilling Co.*, 213 U.S. 151, 171, 29 S.Ct. 458, 53 L.Ed. 742 (1909).

Constructive waiver is less commonly found. *See* Chemerinsky, *supra* § 7.6 at 410. Because "constructive consent is not a doctrine commonly associated with the surrender of constitutional rights," a constructive waiver must be implicit and exceedingly clear. *Welch*, 483 U.S. at 473, 107 S.Ct. 2941. Constructive waiver will be found only if "Congress has ... expressed in unmistakable statutory language its intention to allow States to be sued in federal court under [a specific act]." *Id.* at 475, 107 S.Ct. 2941.

The plaintiffs argue that the state defendants have waived their Eleventh Amendment immunity. The plaintiffs argue that this case is a "continuation" of *City of South Pasadena v. Volpe*, No. CV 73–81–WJR. In that action, the City of South Pasadena sued the state and federal agencies responsible for the 710 Freeway Project claiming that the "Defendants violated (1) the requirements of the National Environmental Policy Act of 1969; (2) the requirements of the California Environmental Quality Act of 1970; and (3) the public hearing requirements of the Federal–Aid Highway Act." (Rep.Mot.Ex. A 11:16–19.) The Court enjoined work on the 710 Freeway Project until the defendants completed the necessary environmental review under the National Environmental Protection Act ("NEPA") and the California Environmental Quality Act ("CEQA").

The plaintiffs argue that because the state defendants consented to federal jurisdiction over the CEQA claims for 25 years, the defendants have waived their immunity for litigation relating to this project.

---

**1.** Jose Medina has been substituted for James W. Van Loben Sels pursuant to Federal Rule of Civil Procedure 25(d).

The state defendants argue that this case is not a continuation of the earlier case. They assert that Judge Rea did not allow the plaintiffs to file a supplemental complaint to add new claims and parties which are a part of this suit. Additionally, they assert that the claims are different in nature between the two suits. In the earlier case the Court focused on requiring the state and federal agencies to prepare the necessary documentation. Here, the issue is whether the completed review satisfies the requirements of NEPA and CEQA, among other statutes.

The state defendants cite to several cases involving the waiver of immunity of Indian tribes. *See McClendon v. United States,* 885 F.2d 627 (9th Cir.1989); *Jicarilla Apache Tribe v. Hodel,* 821 F.2d 537 (10th Cir.1987).

In *McClendon,* there were two cases which involved different parties, but involved the same land rights. *McClendon,* 885 F.2d at 628–29. In the first case, the United States brought an action for ejectment against the Clarks, McClendon's predecessor in interest, seeking to establish permanent title in trust for the Tribe. *Id.* at 628. The case settled, and the government and the Tribe took title and the Clarks were given a long term lease. *Id.* The tribe participated in the settlement, but was not a party to the suit. *Id.* Subsequently, the Clarks assigned the lease to McClendon. *Id.* at 629. McClendon then sued the Tribe for a declaration that the Tribe's actions violated the terms of the lease. *Id.* The Court found that the Tribe had not waived its sovereign immunity from suit by participating in the suit. *Id.* at 630. The Court held "a tribe's waiver of sovereign immunity may be limited to the issues necessary to decide the action brought by the Tribe; the waiver is not necessarily broad enough to encompass related matters, even if those matters arise from the same set of underlying facts." *Id.* Thus, *McClendon* involved related, but not substantially similar or identical claims.

Likewise, in *Jicarilla,* the Tribe sued to cancel certain oil and gas leases on reservation lands awarded by the Department of the Interior. *Jicarilla,* 821 F.2d at 538. A third party then brought a parallel action against the Tribe to enforce those leases. *Id.* The court held that "[a]lthough the Tribe's filing of the *Jicarilla* litigation may have waived its immunity with regard to Dome's intervention in that suit, we cannot construe the act of filing that suit as a sufficiently unequivocal expression of waiver in subsequent actions relating to the same leases." *Id.* at 539. Accordingly, merely because the Tribe consented to jurisdiction on some claims, they did not consent to jurisdiction on all claims arising from the same facts.

■ The cases cited are distinguishable from this case. The state law claims presented in this case are essentially identical to the state law claims in the earlier case. In both cases the plaintiffs challenged the 710 Freeway Project claiming that the defendants failed to meet CEQA's requirements. The additional state law claim under the California Streets and Highways Code is similar to the plaintiffs' CEQA claim in that the plaintiffs argue that the state defendants failed to follow the appropriate procedures in approving this project. Whether the specific issue is the need to prepare an environmental review or the sufficiency of that review, the fundamental issue is compliance with CEQA and related statutes. Moreover, it is undisputed that the state defendants consented to this Court's jurisdiction for 25 years on the plaintiffs' CEQA claims stated in the earlier litigation.

In this case there is a similarity of parties to that in the previous case. Essentially the same plaintiffs, led by the City of South Pasadena, are asserting claims against Caltrans and the federal agencies responsible for approving this project. Additionally, the legal questions are essentially the same—namely whether the state defendants have followed the statutorily mandated procedure in approving this pro-

ject. Finally, the fundamental issue, whether the 710 Freeway Project will be built, has not changed.

Given the state defendants' course of conduct over 25 years and the similarity of facts, parties, and legal theories, the Court finds that the state defendants have expressly waived their Eleventh Amendment immunity with regard to these claims asserted by these plaintiffs with regard to the 710 Freeway Project. This does not mean that the state has waived its immunity on every state law issue potentially involving this project. However, the state's course of conduct over 25 years demonstrates a willingness to have these claims adjudicated in federal court in conjunction with the alleged violations of similar federal laws.

The Court denies the state defendants' motion to dismiss the state law claims.

### C. *Federal defendants' motion to dismiss allegations under Clean Air Act*

The federal defendants have moved to dismiss two of the plaintiffs' claims under the Clean Air Act (the "CAA"). Specifically, the federal defendants argue that the plaintiffs have failed to state a claim that the 710 Freeway Project does not come from a conforming transportation plan and that the defendants failed to analyze particulate matter ("PM sub10")[2] hotspots.

**2.** The regulations define PM sub10 as "particles with an aerodynamic diameter less than or equal to a nominal 10 micrometers." 40 C.F.R. § 50.7(a)(2).

**3.** The regulations require FHWA to create long term transportation plans which will address "at least a twenty year planning horizon." 23 C.F.R. § 450.322(a). "The plan shall include both long-range and short-range strategies/actions that lead to the development of an integrated intermodal transportation system that facilitates the efficient movement of people and goods." *Id.* These plans are updated at least triennially in nonattainment areas such as the South Coast Air Basin. *Id.*

### 1. *Whether the plaintiffs have stated a claim that the 710 Freeway Project does not come from a conforming transportation plan*

The regulations implementing the CAA state that all new projects "must come from a conforming plan and program." 40 C.F.R. § 93.115(a). To come from a conforming plan and program, the project must be "included in the conforming [Transportation Improvement Plan ("TIP") ]."[3] *Id.* § 93.115(c)(1). Additionally, the regulations state that "FHWA/FTA projects must be found to conform before they are adopted, accepted, approved, or funded." *Id.* § 93.104(d).

The plaintiffs argue that the defendants approved the project by signing the Record of Decision ("ROD") before the 710 Freeway Project was found to conform in a TIP. The plaintiffs assert that the 710 Freeway Project was not included in the 1996 TIP.

There are two TIPs at issue here. The first is the 1996 TIP which covers actions taken between fiscal years 1996/97 and 2002/03 (the "1996 TIP"). (Administrative Record ("AR") 105:96–4754.) The second is the 1998 TIP which covers actions taken between fiscal years 1998/99 and 2004/05 ("1998 TIP"). (Decl. of Chester Glenn Clinton ("Clinton Decl.") at 932, 933A.) FHWA made a conformity determination of the 1998 TIP on July 31, 1998. (*Id.* at 932.) This is the date that the 1998 TIP became effective. 23 C.F.R. § 450.324.

Additionally, the regulations require state and public transportation operators to develop a TIP. 23 C.F.R. § 450.324(a). The TIP covers a period of at least three years and is updated at least every two years. *Id.* § 450.324(b), (d). In nonattainment areas, the FHWA and the FTA must make a conformity determination on any new or amended TIP. *Id.* § 450.324(b). The TIP must include all projects receiving federal funding and can only include projects that are consistent with the transportation plan for the region. *Id.* § 450.324(f), (g). Additionally, in nonattainment areas, all projects must be described with sufficient detail to allow for air quality analysis. *Id.* § 450.324(h).

The defendants argue that the plaintiffs' claims are moot because the 1998 TIP supersedes the 1996 TIP and because the 1998 TIP includes all actions anticipated on the project during the relevant three-year time frame.

The regulations state, "FHWA/FTA projects must be found to conform *before* they are adopted, accepted, approved, or funded." 40 C.F.R. § 93.104(d) (emphasis added). For a project to be conforming it must be included in a conforming TIP. *Id.* § 93.115(c)(1).

The Secretary signed the ROD on April 13, 1998. The only conforming TIP in effect at that time was the 1996 TIP. The 1998 TIP was not in effect at that time because it was not issued by the Southern California Association of Governments ("SCAG") until April 16, 1998 or found to be conforming by FHWA and FTA until July 31, 1998. (Clinton Decl. at 932, 933A.)

Therefore, for the ROD to be valid, the regulations require that the 710 Freeway Project have been included in the 1996 TIP. The plaintiffs allege that the 710 Freeway Project was not part of the 1996 TIP. Accordingly, it appears that the plaintiffs have stated a claim that the 710 Freeway Project did not come from a conforming plan. Therefore, the Court denies the defendants' motion on this claim.

2. *Whether the plaintiffs have stated a claim that the defendants failed to analyze PM sub10 hotspots*

The regulations require that FHWA projects:

must not cause or contribute to any new localized CO or PM sub10 violations or increase the frequency or severity of any existing CO or PM sub10 violations in CO and PM sub10 nonattainment and maintenance areas. This criterion is satisfied if it is demonstrated that no new local violations will be created and the severity or number of existing viola-tions will not be increased as a result of the project.

40 C.F.R. § 93.116(a). The regulations provide specific methodology requirements for making this demonstration. *Id.* §§ 93.116(a), 93.123. For PM sub10 hotspots, the regulations state: "The hot-spot demonstration required by § 93.116 must be based on quantitative analysis methods." *Id.* § 93.123(b)(1). However, this requirement will "not take effect until EPA releases modeling guidance on this subject and announces in the Federal Register that these requirements are in effect." *Id.* § 93.123(b)(4). The EPA has not made any such announcement. The regulations also state, however, "Where quantitative analysis methods are not required, the demonstration required by § 93.116 may be based on a qualitative consideration of local factors." *Id.* § 93.123(b)(2).

The plaintiffs argue that the defendants violated the CAA because they undertook no PM sub10 hotspot analysis prior to approving this project. The defendants acknowledge that they did not undertake a quantitative analysis. However, they argue that they were not required to do so because the EPA has not promulgated any regulations setting forth modeling guidance for local hotspots. The plaintiffs respond that the regulations require the defendants to undertake a qualitative analysis of local hotspots where a quantitative analysis is not required. *See id.*

The defendants' argument essentially is that the 40 C.F.R. § 93.123(b)(4) creates an exemption to the requirement that they evaluate local PM sub10 hotspots until the EPA issues regulations effectuating that requirement. This gives the regulation an overly broad reading. Section 93.123(b)(4) speaks only to the quantitative analysis requirement in § 93.123(b). It does not discuss either the specific qualitative analysis or analysis of localized PM sub10 hotspots generally. It never discusses § 93.116.

40 C.F.R. § 93.116 specifically requires FHWA to undertake an analysis of whether the project will create localized PM sub10 hotspots. The regulations define the methodology for this analysis in § 93.123(b). This section provides for two types of analysis—quantitative and qualitative. *Id.* § 93.123(b)(1), (2). It also states, however, that quantitative analysis is not in effect at this time. *Id.* § 93.123(b)(4). Apparently, though, qualitative analysis is an appropriate method for fulfilling the requirements under 40 C.F.R. § 93.116. *Id.* § 93.123(b)(2). Therefore, reading the regulations as a whole and in their most consistent light, it appears that the regulations require FHWA to undertake a qualitative analysis of whether the project will create any localized PM sub10 hotspots regardless of whether EPA has promulgated quantitative analysis modeling guidelines. *Id.* §§ 93.116(a), 93.123(b)(2).

The plaintiffs argue that there is no indication that the defendants conducted either a quantitative or qualitative analysis of localized PM sub10 hotspots. (*See* AR 96:96–1009 (stating PM sub10 "hotspot analyses are not required for this project because the [EPA] has not released modeling guidance nor announced in the Federal Register that these requirements are in effect.").)

The remaining question is whether the plaintiffs' complaint, when read in its most favorable light, has stated this claim. The plaintiffs state:

> The regulations implementing the CAA require FHWA projects not to cause or contribute to any new localized CO or PM [sub10] violations or increase the frequency or severity of any existing CO or PM [sub10] violation in CO and PM [sub10] nonattainment and maintenance areas. 40 C.F.R. § 93.116(a). In order to comply with this regulation, FHWA must demonstrate the absence of new local violations or increases in the severity of violations in accordance with public and interagency consultation require-

ments of 40 C.F.R. § 93.105(c)(1)(i) and the methodology requirements of 40 C.F.R. § 93.123, which requires quantitative analysis of CO and PM [sub10] hotspots. 40 C.F.R. § 93.116(a). Despite its contention to the contrary (ROD, p. 33), FHWA failed to properly consult with the public or to apply the required methodology in its analysis of localized CO and PM [sub10] hotspots.

(First Am.Compl. ¶ 155.) The plaintiffs erroneously state that the regulations require FHWA to conduct a "quantitative analysis of CO and PM [sub10] hotspots." (*Id.*) In fact, the regulations require a quantitative analysis of CO hotspots, but not PM sub10 hotspots. 40 C.F.R. § 93.123. However, the plaintiffs' main allegation is that the "FHWA failed to ... apply the required methodology in its analysis of localized ... PM [sub10] hotspots." (First Am.Compl. ¶ 155.) The required methodology under § 93.123 for PM sub10 hotspots is a qualitative analysis. Therefore, taking the complaint in its most favorable light, the plaintiffs have stated a claim that the defendants failed to perform a qualitative analysis of localized PM sub10 hotspots.

The plaintiffs have stated a claim that the defendants violated the Clean Air Act by not undertaking a qualitative analysis of whether the 710 Freeway Project will create any new PM sub10 hotspots. For these reasons, the Court denies the defendants' motion on this claim.

D. *Motions to dismiss improper congressional influence claim*

The defendants have moved to dismiss the plaintiffs' claims of improper congressional influence for two reasons. First, the defendants argue that the Court does not have jurisdiction to hear this claim because none of the laws under which the plaintiffs are suing authorize a claim of improper congressional influence. Second, the defendants argue that even if there is a jurisdictional basis for this claim, the

plaintiffs have failed to state a claim upon which relief can be granted.

The theory of improper congressional influence has its roots in *D.C. Fed'n of Civic Associations v. Volpe,* 459 F.2d 1231 (D.C.Cir.1971). In *D.C. Fed'n,* the court confronted the issue of whether Secretary Volpe, the Secretary of Transportation, had acted improperly in approving a transportation project. There was evidence in that case that a member of Congress held up the authorization of federal funds on one project until Secretary Volpe approved another project. The court found that several statutes, including Section 4(f) of the Transportation Act, delineated the procedure that the Secretary had to follow in approving the transportation project. The court found that to deviate from that congressionally mandated scheme was a violation of those statutes. Specifically, the court stated:

> If, in the course of reaching his decision, Secretary Volpe took into account "considerations that Congress could not have intended to make relevant," his action proceeded from an erroneous premise and his decision cannot stand. The error would be more flagrant, of course, if the Secretary had based his decision solely on the pressures generated by [the congressman]. But it should be clear that his action would not be immunized merely because he also considered some relevant factors....
>
> We hold only that the Secretary must reach his decision strictly on the merits and in the manner prescribed by statute, without reference to irrelevant or extraneous considerations.

*D.C. Fed'n,* 459 F.2d at 1247–48 (footnotes omitted).

The D.C. Circuit has explained that "*D.C. Federation* ... requires that two conditions be met before an administrative [decision] may be overturned simply on the grounds of Congressional pressure. First, the content of the pressure upon the Secretary is designed to force him to decide upon factors not made relevant by Con-gress in the applicable statute.... Second, the Secretary's determination must be affected by those extraneous considerations." *Sierra Club v. Costle,* 657 F.2d 298, 409 (D.C.Cir.1981); *but see United States ex rel. Sequoia Orange Co. v. Sunland Packing House Co.,* 912 F.Supp. 1325, 1349 (E.D.Cal.1995) (noting that "Members of Congress may seek to influence agency action").

Accordingly, the D.C. Circuit appears to have created a bright line rule that if an administrator takes into account irrelevant or extraneous considerations that the decision is invalid regardless of the merits of the project or the detailed analysis contained within the administrative record. This is a significant shift from the presumption of regularity normally afforded an administrative decision. The Court is unable to find any Ninth Circuit authority recognizing this claim.

 The Court finds that the D.C. Circuit's approach is not consistent with the statutory scheme developed for analyzing administrative decisions. *See* 5 U.S.C. § 706 (stating Court must affirm the Secretary's action unless his acts were "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law"). This Court is disinclined to recognize a new right of action without any basis in statute.

Although the Court does not find that there is a separate right of action for this claim, the Court notes that the allegations the plaintiffs make might be relevant to the ultimate inquiry of whether the Secretary acted arbitrarily, capriciously, abused his discretion, or otherwise acted not in accordance with law. Evidence that the Secretary took irrelevant and extraneous factors into consideration relates to the Secretary's compliance with the relevant constitutionally mandated standards. *See, e.g.,* 40 C.F.R. § 1502.14(a) (stating reviewing agencies must "Rigorously explore and objectively evaluate all reasonable alternatives").

The Court recognizes that the general rule is that its review is limited to the administrative record. However, the Ninth Circuit has stated:

> exceptions exist to the rule that review of agency action is limited to the administrative record. A court may consider evidence outside the administrative record as necessary to explain agency action. *Asarco, Inc. v. United States Environmental Protection Agency*, 616 F.2d 1153, 1159 (9th Cir.1980). *See also Arizona Past & Future Foundation v. Lewis*, 722 F.2d [1423,] 1426 n. 5 [ (9th Cir.1983) ]. When there is "such a failure to explain administrative action as to frustrate effective judicial review," the court may "obtain from the agency, either through affidavits or testimony, such additional explanations of the reasons for the agency decision as may prove necessary." *Public Power Council v. Johnson*, 674 F.2d 791, 793–94 (9th Cir.1982), *quoting, Camp v. Pitts*, 411 U.S. 138, 143, 93 S.Ct. 1241, 1243, 36 L.Ed.2d 106 (1973) (per curiam). The purpose of the court's inquiry should be to ascertain whether the agency considered all relevant factors or fully explicated its course of conduct or grounds of decision. *Asarco, Inc. v. United States Environmental Protection Agency*, 616 F.2d at 1160.

*Friends of the Earth v. Hintz*, 800 F.2d 822, 829 (9th Cir.1986). In a situation such as this where the plaintiffs allege that the Secretary considered irrelevant or extraneous matters not presented in the administrative record, then discovery of that evidence may be necessary to "explain agency actions." *Id*. This evidence, however, is not sufficient to state a new claim, but merely relates to whether the Secretary's decision was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.

Accordingly, the Court grants the defendants' motion to dismiss the plaintiffs' improper congressional influence claim with prejudice.

## II. Motion for a more definite statement

The state defendants have moved for a more definite statement for the plaintiffs' claims of improper congressional influence (First Am.Compl. ¶¶ 158–165) and suppression of other agency assessments. (*Id*. ¶¶ 194–196.) The federal defendants have joined in this motion.

Under the liberal pleading standards, "pleadings in the federal courts are only required to fairly notify the opposing party of the nature of the claim." *A.G. Edwards & Sons, Inc. v. Smith*, 736 F.Supp. 1030, 1032 (D.Ariz.1989). A party may move for a more definite statement if a pleading is "so vague or ambiguous that a party cannot be required to frame a responsive pleading." Fed.R.Civ.P. 12(e).

The plaintiffs suppression of other agency assessment claim is based on violations of California law. The state defendants claim that the "averments ... lack factual specificity or a statutory basis for the granting of relief. Without additional averment, the count fails to offer any meaningful notice of actual dates, involved individuals or other context to its accusation." (State def. mot. 8:5–8.)

As stated above, the plaintiffs must put the defendants on notice as to "the nature of the claim." *A.G. Edwards*, 736 F.Supp. at 1032; Fed.R.Civ.P. 8(a). Only under very limited circumstances such as fraud does a party need to plead claims with "particularity." Fed.R.Civ.P. 9(b).

Here, the plaintiffs allege that the defendants violated CEQA by preventing "the California Secretary for Resources, State Historic Preservation Office, and California Air Resources Board from stating in public all of their professional assessments of the Route 710 Freeway project." (First Am.Compl. ¶ 195.) Specifically, the plaintiffs allege that the "State Defendants failed to make public adverse comments or evaluations received from other agencies[, and] State Defen-

dants failed to circulate a Supplemental or Revised EIS/EIR that would enable and require other public agencies to record publicly their independent assessments of the Route 710 Freeway project." *(Id.)*

 The plaintiffs argue that the state defendants' actions violated, *inter alia,* CEQA's requirements that the lead state agency provide written responses to negative comments received during public review periods. *See* Cal.Pub.Res.Code § 21091(d)(1). This allegation is sufficiently clear as to put the state defendants on notice of the nature of the plaintiffs' claims. Therefore, the Court denies the state defendants' motion for a more definite statement on this claim.

The Court has dismissed the improper congressional influence claim. Therefore, the Court need not address the defendants' motion for a more definite statement on the improper congressional influence claim.

## CONCLUSION

The Court:

1. Denies the state defendants' motion to dismiss the plaintiffs' claims arising under state law;

2. Grants with prejudice the state and federal defendants' motions to dismiss the plaintiffs' "improper congressional influence" claim;

3. Denies the federal defendants' motion to dismiss portions of the plaintiffs' claims under the Clean Air Act; and

4. Denies the state defendants' motion for a more definite statement of the plaintiffs' suppression of other agency assessment claim.

The plaintiffs shall have thirty (30) days from the date of this order in which to file a second amended complaint. The defendants shall have thirty (30) days from the

date the plaintiffs file the second amended complaint to file an answer.

IT IS SO ORDERED.